NO. 07-01-0468-CR



IN THE COURT OF APPEALS



FOR THE SEVENTH DISTRICT OF TEXAS



AT AMARILLO



PANEL E



OCTOBER 15, 2002


______________________________



JIM DWIGHT SHIELDS
,




 Appellant


v.



THE STATE OF TEXAS, 




 Appellee

_________________________________



FROM THE 251st DISTRICT COURT OF POTTER COUNTY;



NO. 41865-C; HON. PATRICK PIRTLE, PRESIDING


_______________________________



Before QUINN and REAVIS, JJ., and BOYD, SJ. (1)

 Appellant Jim Dwight Shields challenges his conviction of indecency with a child in
two points in which he claims error in the court's charge. Those errors include the trial
court's overruling of (1) his objection to the inclusion of the language "touching through
clothing" as part of the definition of sexual contact in the court's charge and (2) his
objection to the inclusion of the language "or the credibility of the witnesses" in the limiting
instruction in which the court instructed the jury as to the purposes for which they could
consider evidence of extraneous offenses and other bad acts. We affirm the judgment of
the trial court. 

 Issue One - Inclusion of "Touching Through Clothing"

 Appellant was charged with intentionally and knowingly engaging in sexual contact
with his daughter who was under the age of 17 by touching her breast with intent to arouse
and gratify his sexual desire. In the court's charge, the jury was instructed that "[f]or
purposes of this law, the term 'sexual contact' means any touching by a person, including
touching through clothing, of the breast of a child, if committed with the intent to arouse or
gratify the sexual desire of any person." The offense was alleged to have occurred on
February 1, 1998, while the victim was clothed and, at that time, sexual contact was not
defined by statute to include touching through clothing. (2) See Tex. Pen. Code Ann.
§21.01(2) (Vernon 1994). Therefore, appellant contends the jury charge "was based upon
the law as it was amended to apply to offenses committed after September 1, 2001." 
Furthermore, "[g]iving a charge based upon the new law rather than the law in effect at the
time of the offense . . . amounts to a violation of the ex post facto clause of the United
States Constitution." We overrule the objection. 

 The trial court is required to provide a charge that sets forth the law applicable to
the case. Tex. Code Crim. Proc.Ann. art. 36.14 (Vernon Supp. 2002). As such, the
charge must contain an accurate description of the law. Ex parte Varelas, 45 S.W.3d 627,
633 (Tex. Crim. App. 2001). However, even before codification by statute of the particular
provision in question, under the case law in existence prior to September 1, 2001, the
State was already permitted to prove sexual contact by touching occurring through
clothing. In Resnick v. State, 574 S.W.2d 558 (Tex. Crim. App. 1978), the court stated that
the essence of the act of touching "is to perceive by the sense of feeling" and rejected the
notion that the existence of a layer of fabric between a person's hand and an object
prevents the person from feeling the object. Id. at 560. Other courts have also followed
this line of reasoning. See In re J.S., 35 S.W.3d 287, 292 (Tex. App.--Fort Worth 2001,
no pet.) (holding that sexual contact may be committed even if the victim is fully clothed); 
Cagle v. State, 976 S.W.2d 879, 882 (Tex. App.--Tyler 1998, no pet.) (holding that contact
can occur even if there is fabric between the defendant's penis and the victim's anus);
Cruz v. State, 742 S.W.2d 545, 548 n.2 (Tex. App.--Austin 1988, no pet. ) (holding that
the fact there was no evidence of flesh-to-flesh contact did not prevent a finding that the
evidence was sufficient to support the conviction of indecency with a child); Guia v. State,
723 S.W.2d 763, 766 (Tex. App.--Dallas 1986, pet. ref'd) (holding that if a layer of fabric
does not prevent occurrence of sexual contact for public lewdness as found in Resnick,
it does not prevent the occurrence of sexual contact for the offense of indecency with a
child). The trial court has broad discretion in submitting proper definitions and explanatory
phrases to the jury. Breckenridge v. State, 40 S.W.3d 118, 122 (Tex. App.--San Antonio
2000, pet. ref'd); Macias v. State, 959 S.W.2d 332, 336 (Tex. App.--Houston [14th Dist.]
1997, pet. ref'd). In this instance, the court instructed the jury on the statutory definition
of sexual contact and also included the interpretation of that provision with respect to
touching that had been established by case law and which was applicable to the particular
facts of this case. Thus, the court's inclusion of the phrase in the charge was an accurate
description of the law in existence at that time and not an abuse of its discretion. 

 Issue Two - Inclusion of "Credibility of the Witnesses"

 In his second issue, appellant complains of a variance between a limiting instruction
given orally during trial and one included in the jury charge. By instructing the jury through
its written charge that they could consider evidence of extraneous acts to assess the
"credibility of the witnesses" (among other things) while omitting that phrase from its oral
instruction to the jury during the presentation of the evidence, the trial court allegedly
erred. "Surely this [was] the Court's equivalent of 'Kings X' and must be considered error
resulting in 'some harm' . . .," concludes appellant. We overrule the issue for the following
reasons.

 First, appellant cites no direct or analogous legal authority in support of his
contention that a variance between an oral instruction during trial and a written instruction
in the court's jury charge constitutes error. Because he did not, he presented nothing for
review. Jenkins v. State, 912 S.W.2d 793, 819 (Tex. Crim. App. 1993). 

 Second, the grounds underlying appellant's complaint on appeal were not those
mentioned at trial. Here, he complains of the variance between the two instructions. 
Below, he asserted that the jury "cannot consider those things for the credibility of the
witnesses . . . in that way . . . it comments on the weight of the evidence." Because the
grounds of complaint asserted here must be included in the objections asserted below and
they do not, appellant's current argument was waived. Penry v. State, 903 S.W.2d 715,
763 (Tex. Crim. App. 1995), cert. denied, 516 U.S. 977, 116 S.Ct. 480, 133 L.Ed.2d 408
(1995). 

 Third, and assuming arguendo that the complaint had been preserved and it
constituted error, see Porter v. State, 709 S.W.2d 213, 215-16 (Tex. Crim. App. 1986)
(holding that the trial court was required to instruct the jury that it could consider the
evidence of extraneous offenses solely in assessing the witness's credibility), we cannot
say it was harmful. Appellant simply states that had he known that the trial court was
going to include reference to credibility in its charge, "perhaps the defense would have
taken a different route." Yet, he does not explain what that alternate route would have
been or its impact, if any, on the eventual outcome of the trial. Finally, our own review of
the record failed to uncover any basis upon which we could reasonably conclude that the
error was harmful in any respect. See Patrick v. State, 906 S.W.2d 481, 492 (Tex. Crim.
App. 1995), cert. denied, 517 U.S. 1106, 116 S.Ct. 1323, 134 L.Ed.2d 475 (1996) (holding
that charge error that was not preserved at trial must be so harmful that the defendant was
denied a fair and impartial trial before it can be the basis for reversal). 

 Accordingly, the judgment of the trial court is affirmed. 

 

 Brian Quinn

 Justice

 

Do not publish.
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by assignment. tex. gov't
code ann. §75.002(a)(1) (Vernon Supp. 2002). 
2. Section 21.11(c) of the Penal Code was changed effective September 1, 2001, to include a
provision that "sexual contact" includes "any touching of any part of the body of a child, including touching
through clothing, with the anus, breast, or any part of the genitals of a person." Tex. Pen. Code Ann.
§21.11(c)(2) (Vernon Supp. 2002). The change applies only to an offense committed on or after the effective
date. 



her purchase the other half, or (3)
purchase Richard Archer's partnership interest and pay off the purchase money mortgage. 
Then, by letter dated January 7, 1994, to Allison, Sterquell recited an agreement with
Richard Archer and Harris that (1) Sterquell had the "opportunity to purchase Richard's
interest and [Harris's] interest at the same terms" and pay the mortgage on the building,
and (2) if Sterquell did not complete the purchase transaction by the end of January,
Richard Archer would "have the same option to purchase mine and [Harris's] interest after
the end of January." Sterquell testified at trial that the "same option" as set out in his letter
was a thirty-day opportunity for Archer to purchase the interests of Harris and Sterquell. 

 Sterquell did not complete the purchase of the Harris and Archer interests in
January. By letter to Sterquell dated February 19, 1994, Harris noted that Sterquell had
not purchased the Archer and Harris interests in the airport building project, Harris
considered Sterquell's deal off, and Harris was trying to sell his 1/3 interest to Richard
Archer. Richard Archer did not contend that he purchased Harris's interest after Sterquell's
January 7th letter, but before July 1, 1994. 

 At trial, Branch Archer (5) and Richard Archer testified that in April, 1994, Branch
became aware that Sterquell had a pending bankruptcy proceeding. Branch immediately
reported the fact to Richard. As it turned out, Sterquell, individually, had filed for Chapter
11 bankruptcy in 1991. The proceeding was ongoing through the formation and initial
stages of the partnership. The bankruptcy proceeding was dismissed in April, 1994. 
Sterquell's PST was listed as an exempt asset in the bankruptcy proceeding.

 The evidence reflects no attempts to sell or transfer any partnership interest or the
airport building itself between Harris's letter of February 19th, and late June, 1994. In late
June, the Amarillo Economic Development Corporation ("AEDC") and Richard Archer
entered into negotiations for sale of the airport building to the AEDC. The negotiations
culminated in an offer by the AEDC to purchase the building for approximately $500,000.

 Archer told the AEDC representative that there were other owners of the building
and that Archer believed they would agree to sell the building. Instead of advising
Sterquell and Harris of his negotiations and discussing a sale of the building with them,
however, Archer consulted his attorney, Hazlewood. Archer and Hazlewood discussed
whether Archer had an obligation to tell Sterquell and Harris of the AEDC negotiations. 
Archer told Hazlewood that Sterquell and Harris had agreed to sell their interests in
December and that the agreements were not consummated. He did not disclose to
Hazlewood that the partnership agreement contained a clause making sale of a partner's
interest void if prior written approval of the other partners was not obtained. Hazlewood
did not read the partnership agreement, but nevertheless drafted an agreement by which
Archer would purchase the interests of Sterquell and Harris in the airport building
partnership as part of settling all accounts and claims pending among the parties. The
agreement contained a recitation that in December, 1993, negotiations had taken place for
sale of Sterquell's interest in the partnership to Archer's PST, and that an agreement had
been reached for sale of Sterquell's interest for $10,000 and indemnity of Sterquell from
indebtedness of the partnership attributable to acquisition of the airport building. 

 Archer next called Harris, who had moved to Wichita Falls in May, 1993. Archer
asked Harris to come to Amarillo. After Harris arrived in Amarillo on July 1st and talked to
Archer, he went to Sterquell and told Sterquell that Archer wanted to work out a complete
settlement of claims among the three of them, to include transfer of Harris's and Sterquell's
partnership interests to Archer. On that same day, Harris, Sterquell, and Archer entered
into negotiations for reciprocal releases of liability together with sale of Harris's and
Sterquell's partnership interests. Agreement was eventually reached whereby Harris's
interest in the partnership was assigned to Archer or nominee, the Sterquell interest in the
partnership was transferred to Archer, and the parties released each other from all claims
in connection with the partnership as well as in connection with other ventures. On July
1, 1994 the parties executed two agreements (collectively "the settlement agreements"):
the Mutual Compromise, Settlement, and Partition Agreement prepared by Hazlewood (the
"Settlement & Partition"), and an Agreement and Mutual Release (the "Mutual Release")
prepared by an attorney representing Sterquell. Both documents recited the formation of
and existence of the partnership. The Mutual Release drawn by Sterquell's attorney
stated, in part: 

 WHEREAS, Sterquell PST, Archer PST and Harris PST formed a
partnership entitled Airport Building L.L.P. which purchased the [airport
building]; and 

 WHEREAS, Sterquell PST wishes to sell its interest in said Airport
Building L.L.P., including, without limitation, any interest in the above-described real estate owned by L.L.P. to Archer PST; 

* * * *


 1. In consideration of the sum of TEN THOUSAND
AND NO/100 DOLLARS ($10,000) payable to it by Archer
PST, Sterquell PST agrees to convey to Archer PST any and
all interest which it holds in Airport Building, L.L.P. and the real
estate owned by Airport Building, L.L.P. . . . 


The Settlement & Partition drawn by Archer's attorney Hazlewood stated, in part:

 Richard O. Harris, a partner in Airport Building, L.L.P., by the execution of
this instrument, confirms his agreement in December, 1993, to sell and
convey to "Archer" his partnership interest . . . .


 A. Airport Building, L.L.P.

 The parties for the purpose of acquiring and managing that
certain improved real estate . . . , have created an entity
named Airport Building, L.L.P., a partnership registered with
the Texas Secretary of State. Various interests in the
partnership are allocated to the parties signatory hereto . . . . 
The parties have negotiated for the sale and transfer of all
interest of the Sterquell parties hereto to the Richard K. Archer
Profit Sharing Trust, culminating in an agreement for such sale
in December, 1993, for the sum of Ten Thousand Dollars and
indemnity of all Sterquell indebtedness of the partnership
attributable to the acquisition of the above referenced real
estate of the partnership. (6) By the execution of this agreement,
the sale is consummated and closed . . . and all Sterquell
interests in the partnership and in the partnership real estate
are hereby set over, transferred, conveyed, assigned, and
delivered to the Richard K. Archer Profit Sharing Plan Trust. 

The Settlement & Partition included a reciprocal release of all claims, both known and
unknown. 

 On July 5, 1994, the AEDC and the partnership, acting through Archer as partner,
entered into an earnest money contract for sale of the airport building for $515,000. The
sale closed on July 13th. The seller's closing statement showed a balance due to Airport
Building, L.L.P., of $335,842.51 after payoff of the purchase money mortgage balance and
closing costs. That amount was deposited to the bank account of Archer's PST on July
13th. On the same day, a check was drawn on the PST for $66,000 in favor of Richard K.
Archer, M.D., P.A., and deposited in the bank account of the Archer P.A. On July 14th, the
Archer PST wire transferred $269,000 to Reba Land, Inc. Reba was an Archer family
investment vehicle. 

 When Sterquell and Harris learned of the sale of the building and that Archer had
been negotiating the sale before July 1st, they each sought one-third of the profits. Archer
declined to share, precipitating a lawsuit by Harris and Sterquell against Archer and Reba. 
Harris and Sterquell asserted via several theories that Archer breached his duty as a
partner to disclose the AEDC offer to purchase the building before their July 1st
negotiations and execution of the Mutual Release and Settlement and Partition
agreements. They alleged that Archer's failure to disclose the AEDC negotiations caused
damages to each of them in the amount of one-third of the net profits from the sale of the
building less $10,000 paid by Archer to each of them for their partnership interests as part
of the July 1st agreements. 

 Archer counterclaimed seeking to rescind or void the partnership agreement and to
recover actual and punitive damages. He alleged that in 1992 Harris and Sterquell entered
into a civil conspiracy to defraud him. Pursuant to that conspiracy, he alleged, Harris and
Sterquell induced him to enter into a business transaction in December, 1992, for the
purpose of acquiring the airport building. Parts of the scheme as alleged by Archer were:
(1) a proposition by Harris and Sterquell that Archer, Sterquell, and Harris would enter into
a partnership, as trustees for their respective profit sharing plans, which would purchase
the airport building; (2) Archer agreed to provide financing for purchase of the real estate;
(3) each of the three agreed to make an initial contribution to the partnership; (4) Sterquell
promised to move administrative offices of American Housing Foundation ("AHF") (7) to the
building as a tenant; and (5) Harris promised to provide management and leasing services. 
Archer claimed that neither Harris nor Sterquell intended to perform the promises they
made. His claim as to Harris included an assertion that when Harris signed the partnership
agreement as trustee for his PST, the PST did not exist. (8) Archer's claim as to Sterquell
included assertions that had Archer known of Sterquell's bankruptcy before entering into
the partnership, he would not have entered the partnership; Sterquell was Archer's CPA;
Sterquell owed Archer a fiduciary duty to disclose the Chapter 11 bankruptcy before the
partnership was formed; and failure to disclose the bankruptcy was fraud. 

 The trial court entered pretrial summary judgment denying Archer's counterclaims
for damages based on fraudulent inducement to enter the partnership, without prejudice
to Archer's asserting the claims defensively. Following the close of evidence at trial,
Sterquell and Harris moved for an instructed verdict on Archer's defensive issues seeking
rescission or voiding of the partnership agreement on the basis of fraudulent inducement. 
The motion asserted that no fact question existed as to Archer's claims being barred by
his ratification of the partnership agreement. The motion was granted. 

 The jury found that (1) Archer, as Trustee, failed to comply with fiduciary duties to
Sterquell and Harris, (2) Archer, individually, committed fraud against Sterquell and Harris,
(3) Sterquell and Harris were each damaged in the amount of $101,947.50, (4) Sterquell
and Harris complied with their fiduciary duties to Archer, (5) neither Sterquell nor Harris
committed fraud against Archer after formation of the partnership but before AEDC
expressed an interest in the airport building, (6) Harris agreed to sell his interest in the
partnership and the airport building before AEDC expressed to Archer an interest in the
airport building, (7) Sterquell did not agree to sell his interest in the partnership and the
airport building before AEDC expressed to Archer an interest in the airport building, (8)
Sterquell did not express in writing his consent for Harris to sell Harris's interest in the
partnership or the airport building, (9) exemplary damages should be assessed in favor of
Sterquell and against Archer in the amount of $750,000, (10) exemplary damages should
be assessed in favor of Harris and against Archer in the amount of $750,000. Harris and
Sterquell only sought recovery against Reba on a theory of constructive trust as to the
$269,000 transferred to it by Archer following closing of the sale of the airport building to
AEDC. 

 Sterquell and Harris moved the trial court to disregard the jury's answer to question
15, and for judgment on the remainder of the verdict. In answer to Question 15, the jury
found that Harris agreed to sell the interest, if any, owned by him or his PST in the
partnership and airport building property before the AEDC expressed an interest to Archer
in purchasing the airport building property. 

 Archer and Reba moved the trial court to disregard all the jury's answers except the
answer to question 15, and to render a take-nothing judgment. 

 The trial judge granted the motion of Archer and Reba as to Harris. The court
based its ruling on (1) the jury's answer to question 15, and (2) Sterquell's January 7, 1994
letter which the court ruled constituted consent to Harris's December sale of his interest
in the partnership to Branch Archer. Judgment was entered for the amounts found in favor
of Sterquell, and a take-nothing judgment was entered as to Harris. 

 Harris urges in a single issue that the trial court erred in failing to enter judgment in
his favor for the damages found by the jury.

 Archer presents six issues in seeking to have the judgment in favor of Sterquell
reversed. Issues one and two urge that Sterquell's breach of fiduciary duties as Archer's
CPA and material misrepresentations constituted fraud which induced Archer to enter the
partnership and warrant rescission of the partnership. Issue three asserts that material
breach of the partnership agreement by Sterquell relieved Archer of any further fiduciary
duty to Sterquell as a partner. Issue four claims that Sterquell's execution of the
Settlement & Partition, with its recitations and release, and acceptance of the recited
consideration, bar him from seeking recovery on the basis of fraud or breach of fiduciary
duty by Archer. Issue five urges that Sterquell's actual damages should have been offset
by all the consideration he received as a result of the July 1st settlement agreements, as
well as by the proportionate responsibility of Harris. By issue six Archer argues that
exemplary damages of 7.5 times the actual damages are factually and constitutionally
excessive. Because of the nature of the issues presented, we first address Archer's
appeal. 

II. ARCHER'S APPEAL (9) 

A. ISSUES ONE AND TWO:

THE PARTIAL SUMMARY JUDGMENT 

AND DIRECTED VERDICT 


 Archer first urges that the trial court erred by granting an interlocutory partial
summary judgment against Archer on his affirmative claims for damages based on
allegations that Harris and Sterquell fraudulently induced him to enter the partnership. He
also urges error in the trial court's granting an instructed verdict against him at trial on his
defensive claims of fraudulent inducement, whereby he sought rescission of the
partnership agreement. Because of the relationship between the summary judgment and
the directed verdict, we consider them together. 

 As set out above, Archer's position is centered around allegations that he was
fraudulently induced to enter the partnership via a conspiracy between Harris and
Sterquell. The bases for his fraud claims were that (1) he would not have entered into the
partnership if Sterquell had disclosed that he was personally in chapter 11 bankruptcy,
which Sterquell had a fiduciary duty to do; (2) Sterquell promised to move the offices of
American Housing Foundation (AHF) into the building as a tenant after the building was
purchased, but Sterquell never intended to do so; (3) Harris promised to work on marketing
and leasing the building, but he never intended to perform his promise, and (4) Sterquell
and Harris never intended to make their initial capital contributions. 

 The interlocutory summary judgment against Archer on his counterclaims against
Sterquell and Harris for fraudulently inducing him to enter the partnership and conspiring
to fraudulently induce him to enter the partnership precluded Archer from offering proof of
and submitting the theories and damage claims to the jury as affirmative claims. The trial
court's summary judgment did not preclude Archer's attempt to prove the theories at trial,
however. The summary judgment expressly provided that the judgment was without
prejudice to the assertion of the claims defensively. On appeal, Archer does not urge that
he was prevented from introducing evidence at trial on the claim that he was fraudulently
induced to enter the partnership. To the contrary, he asserts on appeal that the summary
judgment evidence and trial evidence of fraudulent inducement to enter the partnership is
substantially the same, and his appellate brief on the issues refers us to his response to
the motion for summary judgment. We first address the instructed verdict. 

1. The Instructed Verdict

 In response to Archer's attempt during pendency of the lawsuit to rescind the
partnership agreement, Sterquell and Harris asserted that Archer ratified the agreement. 
Ratification is an affirmative defense. See Montgomery v. Kennedy, 669 S.W.2d 309,
310-11 (Tex. 1984). An instructed verdict was proper only if ratification was conclusively
proved. See Prudential Ins. Co. of Am. v. Financial Review Servs, Inc., 29 S.W.3d 74, 78
(Tex. 2000). 

 Generally, a contract may be either void and a nullity from its inception, or voidable. 
A contract which is voidable because it was the product of fraud is voided only if the
defrauded party proves a right to avoid the contract and chooses to do so. See Swain v.
Wiley College, 74 S.W.3d 143, 146 (Tex.App.--Texarkana 2002, no pet.). A void contract
cannot be ratified; a voidable contract can be ratified. Id. A contract procured by fraud is
merely voidable, unless it is shown to be void for some additional reason. See id. at 146-47; GNG Gas Sys., Inc. v. Dean, 921 S.W.2d 421, 427 (Tex.App.--Amarillo 1996, writ
denied). If a party who has been induced by fraud to enter into a voidable agreement
engages in conduct which recognizes the agreement as subsisting and binding after the
party has become aware of the fraud, the party thereby ratifies the agreement and waives
any right to assert the fraud as basis to avoid the agreement. See Rosenbaum v. Texas
Bldg. & Mortg. Co., 167 S.W.2d 506, 508, 140 Tex. 325 (1943). An express ratification is
not necessary; any act based upon a recognition of the agreement as subsisting or conduct
inconsistent with an intention to avoid it has the effect of waiving the right of rescission. 
Id. The relevant inquiry as to ratification is what actions were taken by the party seeking
to avoid the contract once that party became fully aware of the alleged fraud. See Land
Title Co. of Dallas, Inc. v. F. M. Stigler, Inc., 609 S.W.2d 754, 756-57 (Tex. 1980). Once
a party ratifies an agreement, that party may not later withdraw the ratification and seek to
avoid the contract. See Missouri Pac. R. Co. v. Lely Dev. Corp., 86 S.W.3d 787, 792
(Tex.App.--Austin 2002, pet. dism'd). 

 In reviewing the propriety of the instructed verdict, we view the evidence in the light
most favorable to, and indulge all reasonable inferences in favor of, non-movant Archer. 
See Prudential Ins. Co., 29 S.W.3d at 82. 

 Archer's pleadings and testimony established that no later than the end of
December, 1993, he knew (1) Sterquell was not going to perform what Archer alleged was
a promise to move AHF into the building, (2) Harris had moved to Wichita Falls in May,
1993, and had, according to Archer, made no efforts to market the building, (3) Harris had
agreed to sell his partnership interest to Branch, although Sterquell was taking the position
that Sterquell did not agree to Harris's selling. Richard was responsible for keeping the
partnership books and filing its tax returns. He used his PST bank account as the
partnership account. Archer testified at trial that (1) he learned of Sterquell's bankruptcy
from Branch Archer in the Spring of 1994; (2) he considered his PST to be a one-third
partner in the partnership at all times from the Spring of 1993 until execution of the
agreements of July 1, 1994; and (3) he took no action to rescind the partnership before the
July 1st agreements were made. 

 Thus, before July 1st, Richard was aware of the alleged fraud on which he based
his attempt in the lawsuit to rescind the partnership agreement. Despite such knowledge,
Richard testified at trial (1) he always considered himself, or his PST, to have been a one-third partner in the partnership; (2) he remained in the partnership voluntarily and of his
own free will until July 1, 1994; (3) as of July 1st, he considered that his brother Branch
effectively became owner of two-thirds interest in the partnership via the settlement
agreements and transfers of the interests of Sterquell and Harris. 

 Archer's pleadings consistently asserted the validity of the two July 1, 1994,
agreements. He asserted the validity of the agreements in affidavits, deposition and trial
testimony. The agreements' validity was pled and asserted via both affirmative claims for
damages and defensive theories such as estoppel, waiver, accord and satisfaction, and
release from liability. At the same time, Archer asserted in the lawsuit that he was induced
to enter into the partnership agreement by Sterquell's breach of fiduciary duties as outlined
above, which comprised fraud, and promises made by Sterquell and Harris which they
never intended to fulfill. Archer nevertheless maintained that his interest in the proceeds
of the sale of the airport building was one-third and the interest of Branch's estate, of which
Richard was executor, was two-thirds. He relied on the July 1, 1994, transactions and
settlement agreements in taking such position. 

 Assuming, arguendo, that the actions of Sterquell and Harris complained of by
Archer in fact took place and were fraud, Archer took actions recognizing the partnership
agreement after he learned of those actions. See F. M. Stigler, Inc., 609 S.W.2d at 756-57; Rosenbaum, 167 S.W.2d at 508. Once he ratified the partnership agreement, Archer
could not later rescind it. As the trial court stated in granting the motion for directed verdict
during trial, "Dr. Archer, even today, however, is treating his portion as one-third, and that
can be nothing but ratification." The evidence and pleadings conclusively established
ratification of the partnership by Archer. The directed verdict was proper. 2. The Summary Judgment A party may ratify an agreement induced by fraud in such a way that both the right
to rescind and a claim for damages are foreclosed, although ratification can also be in such
a way that loss of the right to rescind the contract occurs without loss of the right to sue for
damages. See Fortune Prod. Co. v. Conoco, Inc., 52 S.W.3d 671, 677-78 (Tex. 2000). 
So, even though Archer's actions ratifying the partnership agreement barred his attempt
to rescind the agreement, those actions did not necessarily bar the affirmative claim for
damages which was the subject of the partial summary judgment.

 The motion for summary judgment was based on several theories. The order
granting summary judgment did not specify the basis on which the motion was granted. 
In such a situation, the judgment will be affirmed on any meritorious ground expressly
presented in the motion and which is preserved for appellate review. State Farm Fire &
Cas. Co. v. S.S., 858 S.W.2d 374, 380-81 (Tex. 1993). 

 A party may prevail on a summary judgment motion by conclusively establishing the
absence of any genuine issue of a material fact and that the party is entitled to judgment
as a matter of law. Tex. R. Civ. P. 166a(c). We review the granting of summary judgment
using the standards set out in Nixon v. Mr. Property Management Co., 690 S.W.2d 546,
548-49 (Tex. 1985): 

 --The movant for summary judgment has the burden of showing that
there is no genuine issue of material fact and that it is entitled to
judgment as a matter of law. 

 --In determining whether there is a disputed issue of material fact
precluding summary judgment, evidence favorable to the non-movant
will be taken as true.

 --Every reasonable inference must be indulged in favor of the non-movant and any doubts resolved in its favor.


Because Sterquell and Harris were moving for summary judgment as to Archer's
affirmative claim for damages, in order to be entitled to summary judgment they were
required to disprove at least one of the elements of Archer's cause of action, or,
alternatively, to prove each element of an affirmative defense such as ratification. See
Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 644 (Tex. 1995). 

 By part of the very broad release language of the July 1, 1994, Settlement and
Partition, Archer released Sterquell and Harris from all claims and damages which in any
way, directly or indirectly, arose out of transactions described in the Settlement and
Partition. The agreement referenced the partnership, its formation, its operation, and the
sale and transfer of the interests of Harris and Sterquell to Archer. Archer did not assert
in response to the motion for summary judgment of Sterquell and Harris that the
Settlement and Partition did not release his claims for damages against them. See Tex.
R. Civ. P. 166a(c); Casso v. Brand, 776 S.W.2d 551, 553 (Tex. 1989). To the contrary, at
the time the summary judgment was heard, Archer's pleadings and response to the
summary judgment motion urged the validity of the Settlement and Partition. 

 The summary judgment evidence conclusively proved Archer's ratification of the
partnership and that the ratification extended to his claim for damages. The trial court did
not err in granting summary judgment. See Fortune Prod. Co., 52 S.W.3d at 677. 

 Moreover, if the directed verdict was proper and the summary judgment was
improper, the summary judgment did not result in entry of an improper judgment, see Tex.
R. App. P. 44.1(a) (10), because Archer had a full opportunity at trial to present his theory that
Sterquell and Harris fraudulently induced him to enter the partnership. The Settlement and
Partition and Mutual Release agreements were introduced into evidence. Whether
Archer's claims for rescission of the partnership agreement or for damages based on
allegations that he was fraudulently induced to enter the partnership were removed from
the case by the interlocutory pretrial summary judgment or the directed verdict, the result
is the same under this record: he was permitted to introduce evidence on the theories, but
was denied submission of the issue to the jury. See McCall v. Tana Oil and Gas Corp., 82
S.W.3d 337, 343 (Tex.App.--Austin 2001), rev'd on other grounds, 104 S.W.3d 80 (Tex.
2003). 

 In sum, as a matter of law, Archer ratified the partnership agreement in such
manner that he was foreclosed from seeking both rescission and damages. We need not
consider any other grounds presented by Sterquell and Harris in their motion for summary
judgment other than ratification. 

 The trial court did not err either by granting partial summary judgment or directing
a verdict against Archer. We overrule Archer's first and second issues. 

B. ISSUE THREE: MATERIAL BREACH OF PARTNERSHIP

AGREEMENT BY STERQUELL AND HARRIS


 Archer's third issue complains that the trial court erred in granting the motion for
directed verdict of Sterquell and Harris as to Archer's allegations that he owed them no
fiduciary duties because they materially breached the partnership agreement when they
failed to make their initial capital contributions and failed to devote proper time and
attention to partnership affairs. He argues that the evidence raises a fact issue as to the
matters. Archer generally references 23 pages of the record as support for his issue. 

 Sterquell and Harris respond, in part, that their motion for directed verdict did not
address Archer's claim that they had materially breached the partnership agreement, but
that the motion only addressed Archer's defensive claim of fraudulent inducement to enter
the partnership. 

 We agree with Sterquell and Harris. The trial court did not grant a directed verdict
as to the matters alleged by Archer. We overrule issue three. C. ISSUE FOUR: DO THE JULY 1, 1994, SETTLEMENT 

AGREEMENTS BAR THE CLAIMS OF STERQUELL 

 Archer's fourth issue urges that the Settlement and Partition agreement precludes
Sterquell's recovery. His only complaint in this issue as to the jury charge is that the trial
court refused to submit an instruction on estoppel in connection with a jury question
inquiring whether Sterquell agreed to sell his interest in the partnership before the AEDC
expressed an interest to Archer in purchasing the airport building property. Otherwise,
Archer does not complain that the trial court failed to submit a jury question or instruction,
and he points to no jury question in his favor in the issue. Accordingly, except for the
failure of the trial court to submit the estoppel instruction, we construe the issue as urging
that Sterquell is barred from recovery as a matter of law. 

 The issue presents four subparts, although only two of the subparts fall into the
subject matter urged by Archer's statement of the issue. By the first subpart, Archer
asserts that Sterquell is barred from claiming that a breach of fiduciary duty by Archer
induced Sterquell to enter into a settlement of the partnership affairs because the
settlement agreements (1) recited a prior agreement to sell Sterquell's partnership interest,
(2) resulted in consideration paid to Sterquell for his partnership interest as well as for
release of other claims, and (3) released Archer from all claims and causes of action. The
second subpart urges that Sterquell ratified the agreements and is estopped from asserting
the releases are invalid because he has retained the $10,000 Archer paid pursuant to the
releases. In the third subpart Archer claims that Sterquell's January 4, 1994, letter was a
dissolution of the partnership. The fourth subpart presents the claim that Sterquell's
January 7, 1994, letter granted an option to Archer to purchase Sterquell's interest. 

 As to the first subpart, neither the mere recitation in the July 1st Settlement and
Partition of a prior agreement by Sterquell to sell his partnership interest nor the payment
of consideration to Sterquell upon execution of the Settlement and Partition terminated the
partnership on some date before execution of the Settlement and Partition. See Rodgers
v. RAB Invs., Ltd., 816 S.W.2d 543, 547 (Tex.App.-Dallas 1991, no writ). So long as the
partnership existed, Archer had a fiduciary duty to disclose the June negotiations to
Sterquell. See M.R. Champion, Inc. v. Mizell, 904 S.W.2d 617, 618 (Tex. 1995).

 Archer's reliance on Steubner Realty 19 v. Cravens Rd. 88, 817 S.W.2d 160
(Tex.App.-Houston [14th Dist.] 1991, no writ), is misplaced. In Steubner Realty 19, the
purchaser of realty claimed damages because of an easement which prevented
development of the property. The evidence, however, showed that the purchaser had
originally negotiated for a price reduction because of the easement's existence. Under
such circumstances the purchaser was estopped from taking a post-sale position
inconsistent with pre-sale actions demonstrating the purchaser knew of the easement. Id.
162-64. Archer, however, does not claim that Sterquell had knowledge of Archer's
negotiations to sell the airport building at a profit when the July 1st agreements were
negotiated. 

 Archer likewise misplaces his confidence in Schlumberger Tech. Corp. v. Swanson,
959 S.W.2d 171 (Tex. 1997), in asserting that Sterquell released his claims for breach of
fiduciary duty by the settlement agreement language. In Schlumberger the Supreme Court
affirmed two principles: (1) merger clauses in releases can be avoided based on fraud in
the inducement; but (2) parties to a settlement agreement may validly disclaim reliance on
representations which might otherwise warrant a claim of fraud in the inducement. Id. at
179. The Court also noted that the issue when merger clauses are present in settlement
agreements is whether the disclaimer of reliance is binding under the particular facts
presented. Id. In Schlumberger, the disclaimer was held to be binding. The facts
presented in Schlumberger, however, included arms-length negotiations, discussions
involving the very subject matter which the Swansons claimed was misrepresented to
them, and the existence in the agreement of language specifically disclaiming reliance on
statements or representations of other parties. Moreover, the Court clearly stated that
even a disclaimer of reliance on prior statements and representations, or a merger clause,
will not always bar fraudulent inducement claims, and that there was no evidence of a
fiduciary or confidential relationship between the parties. Id. at 181.

 Unlike Schlumberger, the record before us manifests a fiduciary relationship. There
is no evidence that the parties intended to settle their disputes and partnership affairs with
both sides having knowledge of or there having been negotiations about the imminent sale
of the partnership property for a profit of over $300,000. Nor is there language in either of
the agreements specifically disclaiming reliance on statements, representations, or non-disclosures of material information by the other parties. The record does not support
Archer's position that, as a matter of law, the agreement was intended to release claims
for breach of a fiduciary duty to disclose material information.

 By the second subpart of issue four Archer urges that Sterquell ratified the July 1st
settlement agreements and is estopped from asserting the releases are invalid. When
Sterquell discovered Archer's sale of the airport building soon after execution of the July
1st agreements, he took action indicating his disapproval of the events. Sterquell promptly
protested Archer's failure to timely disclose the June, 1994 negotiations to sell the airport
property; demanded a share of the profits; and then filed suit. Sterquell's protest, demand
and filing suit were not inconsistent with prior positions he had taken. (11) Sterquell chose a
remedy available to him: retain the consideration paid by Archer, stand on the agreements
and seek damages caused by his execution of them. See Dallas Farm Machinery Co. v.
Reaves, 307 S.W.2d 233, 238-39 (Tex. 1957); Amarillo Transfer & Storage Co. v. De
Shong, 82 S.W.2d 381, 385-86 (Tex.Civ.App.--Amarillo 1935, no writ). The evidence did
not establish that Sterquell, as a matter of law, ratified the agreements as releasing Archer
for his breach of fiduciary duty to disclose the AEDC offer, or was estopped from asserting
that Archer fraudulently induced Sterquell to enter into the agreements and that Sterquell
was thereby damaged. 

 As part of the second subpart of the fourth issue, we address Archer's complaint as
to the jury charge. Archer submitted a proposed jury question inquiring whether Sterquell
agreed to sell his interest in the partnership before the AEDC expressed interest in the
property to Archer. The proposed question included two instructions, one of which Archer
alleges would have allowed the jury to determine whether Sterquell was estopped from
denying an agreement in December, 1993, to sell his partnership interest. The trial court
refused to submit the question as proposed by Archer, but submitted substantially the
same question without the proposed estoppel instruction, as jury question 16. Archer
objected to the trial court's failure to submit the estoppel instruction he included within his
proposed jury question and obtained a ruling, although he did not submit a separate written
proposed instruction on estoppel. Sterquell responds, in part, that Archer did not preserve
error because a proposed instruction was not submitted separately as required by Tex. R.
Civ. P. 278, and that the instruction Archer submitted was incorrect as well as confusing. 

 We review a trial court's decision to submit or refuse a particular instruction under
an abuse of discretion standard. See In re V.L.K., 24 S.W.3d 338, 341 (Tex. 2000). We
agree with Archer that under the record presented, he adequately and timely brought his
complaint and instruction to the trial court's attention, obtained a ruling, and thereby
preserved error. See Alaniz v. Jones & Neuse, Inc., 907 S.W.2d 450, 451 (Tex. 1995).

 The jury question inquired whether Sterquell agreed to sell the interest he or his
profit sharing trust claimed in the airport building partnership and property before the AEDC
expressed an interest to Archer in purchasing the airport building. The instruction Archer
requested was, in part, that Sterquell could not deny he agreed to sell his interest if the
denial was inconsistent with a position they had previously taken and Archer did not know
that Harris would deny that they agreed to sell their interest. The instruction did not clarify
whether "his" interest included the interest of Sterquell's profit sharing trust, and did not
explain who was referred to by the words "they" and "their." Reading the instruction in
conjunction with the jury question to which it related, the instruction could have been
construed by the trial court as confusing and unclear. The trial court's refusal to give the
instruction was not an abuse of discretion and was not arbitrary or unreasonable. See
Goode v. Shoukfeh, 943 S.W.2d 441, 446 (Tex. 1997). The refusal to give the instruction
was not error. 

 In the third subpart of issue four, Archer claims that Sterquell's January 4, 1994,
letter was a dissolution of the partnership, and that following dissolution of the partnership,
Archer did not owe a duty to his former partner to disclose a business opportunity which
arose after dissolution. He does not argue that the trial court refused to submit a jury
question inquiring as to dissolution, such as whether Sterquell intended to dissolve the
partnership by the letter. Thus, we are faced with Archer urging, at bottom, that the
language of Sterquell's letter, as a matter of law, dissolved the partnership. 

 Archer refers us to Thomas v. American Nat'l Bank, 704 S.W.2d 321, 323-24 (Tex.
1986), for the proposition that Sterquell dissolved the partnership when he expressed a
desire to sell his partnership interest in the January, 1994, letter. In Thomas, the
partnership consisted of three partners. Thomas, one of the three partners, testified that
he told the managing partner of PGR Investments Company, a second partner, that
Thomas and the third partner wanted to end the partnership. The trial court granted
summary judgment that the partnership had not been dissolved by Thomas' actions. Id.
at 322. The Texas Supreme Court reversed the summary judgment. In doing so, the
Court noted that a partnership may be dissolved by the express will of a partner, and held
that Thomas' testimony was some evidence that he expressly intended to and did dissolve
the partnership by making the statement he testified to. Id. at 323-24. 

 We do not read Sterquell's letter of January 7, 1994, to set out his express will that
the partnership be dissolved. To the contrary, the letter contemplates continuation of the
partnership. In it Sterquell makes offers, in the alternative, for Sterquell to purchase
interests of Harris and Archer or to allow Archer to purchase interests of Sterquell and
Harris. Via the July 1st agreements the interests of Sterquell and Harris were in fact sold,
after which the partnership sold the airport building through Archer, one of its continuing
partners. The letter did not, as a matter of law, dissolve the partnership. 

 The fourth subpart of issue four presents the claim that Sterquell's January 7, 1994,
letter granted an option to Archer to purchase Sterquell's interest. In that letter, Sterquell
confirmed an agreement with Archer and Harris that Sterquell could purchase both of their
interests if he did so by the end of January; and that if he did not do so, then Archer would
have the "same option" to purchase the interests of Sterquell and Harris. In presenting his
argument, Archer argues that when the optionee elects to purchase property pursuant to
an option, then a contract for sale arises. He continues by reasoning, without citation to
any authority, that the existence of the option to purchase removed any fiduciary duty
Archer would have had to disclose the discovery of a buyer for the partnership property. 

 We disagree. Assuming, arguendo, the bare existence of a valid option to purchase
the interest of Sterquell would have terminated Archer's fiduciary duty to Sterquell, the
existence of such an option until July 1st was disputed. Sterquell's position, supported by
evidence, was that Archer's option was for only 30 days following the end of January,
1994. Archer does not present a jury finding on the duration of the option, which Archer
apparently views as having extended indefinitely. Nor does Archer claim to have exercised
the option at any time prior to the July 1st negotiations and agreements. Given this state
of the record, Archer's partnership relationship with, and his attendant fiduciary duty to,
Sterquell existed until the relationship was terminated by the July 1st agreements. See
M.R. Champion, Inc. 904 S.W.2d at 618. Liability for breach of such duty existed so long
as the duty existed. Id. Issue four is overruled. D. ISSUE FIVE: REDUCTION OF ACTUAL DAMAGES

BY OFFSET OR PROPORTIONATE RESPONSIBILITY 


 Archer next urges that the actual damages awarded to Sterquell should be reduced
by (1) recoupment or setoff in the total amount of consideration Sterquell received from
Archer as a result of the July 1st settlement agreements, and (2) the proportionate
responsibility of Harris. The issue is presented in two parts and we will address it in that
manner.

1. Recoupment or Setoff 

 First, Archer challenges the jury's finding to jury question 18. Question 18 was
conditioned on the jury having previously found that Sterquell suffered actual damages,
and asked the jury to find what sum of money, if any, should be subtracted from the actual
damages as recoupment or setoff. The jury was instructed to consider only money paid
to Sterquell as consideration for the two July 1st agreements, other than "the $10,000." 
The question placed the burden of proof on Archer. The jury answered "0.00." 

 Archer's issue initially asserts that, as a matter of law, Sterquell's damages should
be offset by $45,000 which Sterquell received as consideration for the releases set out in
the July 1st agreements. His argument, however, urges that the evidence is factually
insufficient to support the jury's answer and is against the overwhelming weight of the
evidence. Archer posits that Sterquell disclaims his obligations under the agreements,
and thus is not entitled to retain the $45,000 as a benefit of the agreements. 

 Archer does not favor us with authority addressing (1) the doctrines or elements of
setoff or recoupment, (12) (2) the burden of proof, or (3) the standards of review. (13) Nor does
he reference the record except for references to jury question 18 and a copy of the
$55,000 check from Archer to Sterquell. We consider the issue insufficiently briefed. See
TRAP 38.1(h). 

 Moreover, Archer mischaracterizes Sterquell's position. As we have previously
noted, Sterquell did not disclaim or seek to set aside the agreements or avoid the releases
in the agreements; he claimed damages because of the agreements' existence. Both
agreements of July 1st referenced Palo Duro, L.L.P., as one of the entities other than the
airport building partnership in connection with which Sterquell and Archer had been
involved on a business basis. The agreements addressed claims which Sterquell asserted
for services rendered to or for the benefit of Palo Duro, and which were compromised and
settled as part of the agreements. The amount of $45,000 specifically referenced
Sterquell's claims in regard to Palo Duro. The agreements also specifically set out the
amount of $10,000 as payment for Sterquell's interest in the Airport Building partnership. 
Unobjected-to testimony by Sterquell during trial confirmed that $45,000 was for services
he claimed to have rendered for the benefit of Palo Duro, independent of the Airport
Building partnership. 

 Question 18 was conditioned on the jury having previously found actual damages
to Sterquell in response to jury question 6. Jury question 6 instructed the jury to consider
as elements of damages only the share of the sales proceeds of the airport building to
which each partner would have been entitled, less amounts required to pay off the note,
other closing costs of the sale, and the $10,000 already paid to each partner by Archer for
their airport building partnership interest. The settlement agreements and Sterquell's
testimony are legally and factually sufficient evidence to support the jury's answer to
question 18. See Sterner, 767 S.W.2d at 690; Herbert v. Herbert, 754 S.W.2d 141, 144
(Tex. 1988).

2. Proportionate Responsibility of Harris

 The trial court refused to submit Archer's proposed question asking the jury to find
the percentage of Sterquell's actual damages which were caused by Archer and the
percentage caused by Harris. Archer relies on Tex. Civ. Pract. & Rem. Code Ann. §
33.003 (Vernon 1997), (14) but does not cite any case authority in support of his position. 

 In advancing his theory, Archer refers to evidence that Harris encouraged Archer
to end the relationship with Sterquell as early as November, 1993; wrote a note in
December, 1993, indicating that if Sterquell did not agree to sell his partnership interest,
Harris "would get it done"; and acted as a go-between as to Archer and Sterquell because
Archer and Sterquell were not talking with each other during the months before July 1,
1994. Archer does not claim that before execution of the July 1st agreements Harris had
knowledge of Archer's June, 1994, negotiations with the AEDC. 

 Sterquell and Harris filed suit in July, 1994. As Sterquell points out, section 33.002
specifically excluded claims based on intentional torts from chapter 33's comparative
responsibility provisions until the Civil Practice and Remedies Code was amended in 1995. 
See Act of May 18, 1995, 74th Leg., R.S. ch. 136 § 1, 1995 Tex. Gen. Laws 971. The law
in effect prior to September 1,1995, was continued in effect and applied to causes of action
which accrued before September 1, 1995, and on which suit was filed before September
1, 1996. Id. § 3 at 976. 

 Sterquell claimed that Archer intentionally withheld information about the AEDC
negotiations. Section 33.003 did not apply to Sterquell's claim. The trial court did not err
in refusing to submit Archer's proposed question to the jury. 

E. ISSUE SIX: EXEMPLARY DAMAGES

 Archer's sixth issue challenges the award of exemplary damages. His challenge is
presented in two parts. First, Archer challenges the factual sufficiency of the evidence to
support the amount of exemplary damages. Second, he asserts that the exemplary
damages are unconstitutionally excessive because they exceed four times actual
damages. 

 Archer relies on, in part, Apache Corp. v. Moore, 960 S.W.2d 746
(Tex.App.-Amarillo 1997, pet. denied), and its reference to BMW of North America, Inc.,
v. Gore, 517 U.S. 559, 116 S.Ct. 1589, 134 L.Ed. 2d 809 (1996). He does not assert that
the jury findings of breach of fiduciary duty (question 1) with the intent to gain an additional
benefit for himself or his PST (question 3) and fraud (question 4) are insufficient to support
exemplary damages. See Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 23 n.16 (Tex.
1994) (only if a tort is accompanied by gross negligence, intentional injury, fraud or malice
are punitive damages proper). 

 Sterquell responds that Archer's actions constituted an intentional tort and that the
Legislature excluded such torts from the limitation on exemplary damages in the law
effective at the time of Archer's actions. See Act of June 16, 1987, 70th Leg., 1st C.S. ch.
2 § 2.12, 1987 Tex. Gen. Laws 44-5. Sterquell argues further that, as evidenced by
subsequent amendments to chapter 41 of the Texas Civil Practice and Remedies Code, 
the Legislature has regarded and does regard actions such as Archer's to be so egregious
that those actions have been exempted from limitations on exemplary damages. He
references TCPRC § 41.008(c)(10) (misapplication of fiduciary property). He argues that
the jury's exemplary damages award of $750,000 was less than 7.5 times the actual
damages of $101,947.50, is not limited by statute, is not constitutionally excessive, and is
supported by abundant evidence. We will begin by reviewing whether the exemplary
damages are unconstitutional because they exceed four times actual damages. 

 The assessment of the extent of a plaintiff's injury and the measure of what amount
of actual damages is reasonably necessary to compensate for the injury is essentially a
factual determination. See Cooper Indus., Inc. v. Leatherman Tool Group, Inc., 532 U.S.
424, 432, 121 S.Ct. 1678, 1683, 149 L.Ed.2d 674 (2001). The awarding of exemplary or
punitive damages is not such a measurement, however. The awarding of exemplary
damages is a reflection of moral condemnation of the conduct in question which is
designed to punish the perpetrator and deter such conduct in the future. See State Farm
Mut. Auto Ins. Co. v. Campbell, 123 S.Ct. 1513, 1519, 155 L.Ed.2d 585 (2003); TCPRC
§ 41.001. As such, the decision of whether to assess exemplary damages and if so, the
amount to assess is not, at bottom, a "question of fact" as that term is generally used in
appellate review. See Cooper, 532 U.S. at 437. Rather, the decision is a matter entrusted
to the discretion of the jury, within certain boundaries, just as the assessment of criminal
penalties is entrusted to the discretion of the jury within confines of the penalties
legislatively prescribed for the particular crime. See id. at 432-34. See also TCPRC
section 41.010 (b) (determination of amount of exemplary damages to be awarded is within
discretion of the trier of fact). The amount of exemplary damages is not considered
excessive, that is, to have resulted from impermissible motives such as passion or
prejudice, or to have been assessed in disregard of the evidence, so long as the amount
of exemplary damages is reasonably proportioned to actual damages, see Alamo Nat'l
Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981), and proportional to the gravity of the
offense; that is, not excessive under the facts presented. See Cooper, 532 U.S. at 434-35,
(Due Process Clause of the Fourteenth Amendment to the Federal Constitution is violated
when exemplary damages are grossly disproportional to gravity of defendant's offense);
Gore, 517 U.S. at 568. Because of the wide discretion allowed to the jury in assessing
exemplary damages and the potential for arbitrary deprivation of property by assessment
of such damages, appellate courts are to review the Fourteenth Amendment's Due
Process excessiveness question de novo. See Campbell, 123 S.Ct. at 1519-20; Cooper,
532 U.S. at 435-36; Gore, 517 U.S. at 586. In referencing de novo review, however, the
Supreme Court noted that appellate review should be with deference to findings of fact
made at the trial court level, unless such findings are clearly erroneous. See Cooper, 532
U.S. at 440 n.14. Such a standard of review is comparable to the standard by which Texas
appellate courts review factual findings for legal and factual sufficiency, and review legal
conclusions de novo, see BMC Software Belgium, N.V. v. Marchand, 83 S.W.3d 789, 794
(Tex. 2002), as opposed to true de novo appellate review whereby the appellate court
exercises its own judgment and redetermines each issue of fact and law giving no
deference to the trial court's decisions. See Quick v. City of Austin, 7 S.W.3d 109, 116
(Tex. 1998).

 In the matter pending before us, the trial court examined the amount of exemplary
damages for excessiveness according to the criteria identified in Apache and Gore. The
trial court found that the exemplary damages were not excessive. We review the federal
due process excessiveness question by giving deference to the jury's findings and the trial
court's determination that the exemplary damages were not excessive. See Cooper, 532
U.S. at 440 n.14, 121 S.Ct. at 1688 n.14; BMC Software, 83 S.W.3d at 794. 

 In Gore, the United States Supreme Court set out three "guideposts" for evaluating
whether an exemplary damages award is excessive when considering federal due process
requirements: (1) the degree of reprehensibility of the defendant's conduct, (2) the ratio
between harm or potential harm to the plaintiff and the amount awarded (measure of
punishment must be both reasonable and proportionate to the amount of harm to plaintiff
and to the actual damages recovered), and (3) the disparity between the exemplary
damages assessed and civil penalties authorized or imposed in comparable cases. See
Campbell, 123 S.Ct. at 1520-21, 1524, 1526; Gore, 517 U.S. at 574-85. (15) 

 The most important guidepost in reviewing the reasonableness of a punitive
damages award is the degree of reprehensibility of the defendant's conduct. Campbell,
123 S.Ct. at 1521. In determining reprehensibility, we consider whether (1) the harm
caused was physical as opposed to economic; (2) the tortious conduct evinced a reckless
disregard of the health or safety of others; (3) the target of the conduct had financial
vulnerability; (4) the conduct involved repeated actions or was an isolated incident; and (5)
the harm was the result of intentional malice, trickery, deceit, or mere accident. Id. 

 Although some friction existed among Archer, Harris, and Sterquell during latter
1993 and the first months of 1994, Archer was accused only of tortious conduct in
connection with his concealing of the AEDC offer from Sterquell and Harris prior to and
during negotiations leading to the July 1, 1994, agreements. Archer, Harris, and Sterquell
were all reasonably sophisticated businessmen. All had been involved in transactions
involving tax shelters, real estate transactions and investments of other kinds. Harris was
a retired banker and had been a bank president. Sterquell was a certified public
accountant who originated and participated in what some would consider complex tax-advantaged transactions in addition to his accounting practice. Archer was an active
investor and member of a family which had broad-ranging investments to the extent that
Reba Land was incorporated as a vehicle to hold some of the family investments. The
partners in the airport building partnership were profit sharing trusts, not the men
themselves. All three men had in the past been represented by and were represented by
attorneys in their business dealings during the existence of the partnership and during the
July 1st negotiations which led to execution of the settlement agreements. 

 Considering factors one, four and five of the first Gore guidepost, we see that the
harm to Sterquell was economic, Archer's tort was an isolated instance, but it was an
intentional action intended to gain a benefit for himself in violation of his fiduciary duty. As
to factor three, Sterquell was not in a position of financial vulnerability. His bankruptcy had
been dismissed before July 1, 1994. In any event, Sterquell's PST, which was the actual
partner in the partnership, was an exempt asset in the bankruptcy. Factor two is
inapplicable to this matter: Archer's conduct did not involve the physical health or safety
of others. The facts before us, measured by the factors under the first and most important
Gore guidepost, lead us to conclude that Archer's conduct in withholding information was
reprehensible, yet without indicia which elevates its classification to what the United States
Supreme Court has referred to as "particularly egregious." 

 The second guidepost in determining whether exemplary damages are
Constitutionally excessive involves the ratio between harm or potential harm to the plaintiff
and the amount awarded. Campbell, 123 S.Ct. at 1524. There is no bright-line
Constitutional ratio to define awards which are excessive. Citing legislative history of ratios
of double, triple and quadruple actual damages as instructive, the Supreme Court recently
referenced language in its prior opinions that ratios of more than four times compensatory
damages might be close to the line of Constitutional propriety. Id., citing Gore and Pacific
Mut. Life Ins. Co. v. Haslip, 499 U.S. 1, 111 S.Ct. 1032, 113 L.Ed.2d 1 (1991). Particularly
egregious actions resulting in injuries which are hard to detect or damages which are
difficult to determine might warrant higher ratios, while in cases involving substantial
compensatory damages, then a lesser ratio, "perhaps only equal to compensatory
damages," can reach the outermost limit of the due process guarantee. Campbell, 123
S.Ct. at 1524. 

 In considering this second guidepost, we consider that actual damages of
$101,947.50 are not insubstantial. Potential damages to Sterquell are not a factor to be
considered as there were no further damages which could have occurred. It was not
difficult for Sterquell to determine that he had suffered damages and the amount of the
damages. Calculating one-third of the net profit from the sale of the airport building was
a fairly simple matter of reviewing closing statements from the sale of the building.

 The factors of the second Gore guidepost indicate that a Constitutionally-permissible
award of exemplary damages under these facts would be in the category of a "lesser ratio"
as referenced by the United States Supreme Court. See id. 

 The third Gore guidepost requires consideration of the exemplary damages award
and civil penalties authorized or imposed in comparable cases. Our review is guided to
a large extent by our consideration in Apache of an exemplary damages award which was
not limited by applicable statutory law. On original submission in Apache, we affirmed
awards with ratios of exemplary damages to actual economic damages of 185:1 and 92:1. 
The United States Supreme Court remanded the case for reconsideration in light of its
decision in Gore. Upon remand, we looked, in part, for guidance in acts of the Legislature,
even though those acts were not applicable to the claims in Apache. We noted the
Legislature's limitation of exemplary damages to the greater of four times actual damages,
or $200,000, as to some actions. Apache, 960 S.W.2d at 749-50. We also noted the
Legislature's subsequent limitation of exemplary damages in certain actions to an amount
equal to the greater of (1) two times the amount of economic damages plus an amount
equal to noneconomic damages not to exceed $750,000, or (2) $200,000. Id. See TCPRC
§ 41.008(b) (Vernon Supp. 2004). We held that under the Gore guideposts and the
particular facts of Apache, an award of exemplary damages exceeding four times
economic damages was constitutionally excessive. Apache, 960 S.W.2d at 750. 

 Sterquell argues that Archer's action in selling the airport building after Sterquell and
Harris sold their partnership interests via the July 1st agreements was, in effect, a
misapplication of fiduciary property. He references TCPRC § 41.008(c)(10) which provides
that the limitations on exemplary damages of chapter 41 do not apply if a cause of action
is based on a defendant's actions described as a felony by Tex. Pen. Code Ann. § 32.45
(Vernon Supp. 2004) (misapplication of fiduciary property).

 In making his argument that Archer misapplied fiduciary property, Sterquell does not
disclose the basis on which he claims a fiduciary relationship continued to exist between
Archer and Sterquell after Sterquell sold his partnership interest to Archer via the July 1st
agreements. Sterquell and Harris did not seek rescission of the agreements. Sterquell
does not contend that he somehow remained a partner with or had any other relationship
to Archer after executing the agreements and transferring his partnership interest to
Archer. Nor does Sterquell present jury findings that at the time the airport building was
sold to the AEDC, Archer was holding the building as a "fiduciary" in regard to Sterquell,
and that Archer "misapplied" property by dealing with it contrary to (1) an agreement with
Sterquell under which Archer held the property, or (2) a law prescribing the custody or
disposition of the property. See Penal Code §§ 32.45(a)(1),(2),(b). Sterquell's argument
does not persuade us that the Legislature has exempted conduct such as Archer's from
the provisions of chapter 41 as it has been amended, (16) and that we should not look to
Apache for guidance. 

 The economic injuries caused by the defendants in Apache were not deemed to
have been intentionally inflicted. Apache, 960 S.W.2d at 749. The jury in this matter found
that Archer's actions were intended to benefit himself to the detriment of his partners. On
the other hand, the plaintiffs' economic damages in Apache were $2,706 and $5,425,
much more modest sums than the $101,947.50 economic damages to Sterquell. As we
did in Apache, we note and give consideration to the Legislature's view of appropriate
ratios of exemplary damages for causes of action such as the one before us as expressed
in statutory enactments, although the enactments apply only to causes of action arising
later in time to the cause before us. Doing so, we agree with Archer that under the facts
of this case, the exemplary damages award in excess of four times Sterquell's actual
economic damages exceeds the ratio permitted by the Due Process Clause of the
Fourteenth Amendment. See Campbell,123 S.Ct. at 1524; Apache, 960 S.W.2d at 750. 

 We sustain Archer's sixth issue to the extent it challenges the Constitutional
excessiveness of the exemplary damages award. Because we sustain Archer's issue on
the basis of the Federal Constitution's Due Process Clause, we do not consider his
arguments as to the Texas Constitution. See TRAP 47.1. 

 We next address Archer's contention that the evidence is factually insufficient to
support the exemplary damages award. Because we have determined that exemplary
damages in excess of four times actual damages is Constitutionally excessive, our review
will be limited to reviewing the evidence in regard to the amount of exemplary damages
which is four times actual damages. In considering factual sufficiency of the evidence to
support an amount of exemplary damages we review all the evidence in regard to (1) the
nature of the wrong, (2) the character of the conduct involved, (3) the degree of culpability
of the wrongdoer, (4) the situation and sensibilities of the parties concerned, (5) the extent
to which such conduct offends a public sense of justice and propriety, and (6) the net worth
of the defendant. See TCPRC § 41.011; Kraus, 616 S.W.2d at 910. In doing so, we will
not repeat all the evidence set out previously in our opinion, but we refer the parties to those
discussions. In relating the evidence to the above-referenced factors, however, we note
that very few of the facts were disputed. For instance, Sterquell and Harris agreed that
Archer had never lied to them and had always done what he said he would do in their
several dealings over the years. Archer testified, and Sterquell concurred, that contrary to
the recitation in the Settlement and Partition agreement drafted by Archer's attorney
Hazlewood, Sterquell did not agree in December, 1993, to sell his partnership interest. 
Archer was not aware of any written permission by Sterquell for Harris to sell his interest in
December. Archer understood that the partnership agreement contained a provision
requiring prior written permission of the other partners for sale of a partnership interest, and
providing that an attempted sale of a partnership interest in violation of the provision was
void. Archer testified that he considered that as of the end of December, 1993 and at all
times up until execution of the July 1st agreements, Sterquell, Harris and he were partners. 
Archer agreed at trial that as a partner he owed fiduciary duties to Sterquell and Harris
which included the duties to (1) ensure the July 1, 1994, transaction was fair and equitable
to his partners Sterquell and Harris, (2) make reasonable use of the confidence that his
partners placed in him, (3) act in the utmost good faith and exercise the most scrupulous
honesty towards Sterquell and Harris, and (4) not use his position to gain benefit for himself. 
There was no evidence before the jury that Archer's conduct was motivated by need or any
goal other than to secure all profits from sale of the airport building for himself and his
brother, Branch, at the expense of Sterquell and Harris. Unchallenged evidence was
admitted at the exemplary damages phase as to attorney's fees for Sterquell and Harris to
prosecute their case. 

 We also consider the evidence as to the nature of the wrong, the character of
Archer's conduct involved, the degree of Archer's culpability, and the extent to which his
conduct offends a public sense of justice and propriety. The evidence was sufficient for the
jury to have determined that Archer's actions in consciously concealing the AEDC
negotiations from Sterquell and Harris via, in part, a concealment of the true facts from his
own attorney when Archer sought advice about disclosing the AEDC negotiations, were a
calculated violation of fiduciary duties of which he was aware, to the disadvantage of two
men who had come to trust Archer through prior years and multiple business dealings and
who brought the airport building investment opportunity to Archer initially.

 In considering the evidence as to the situation and sensibilities of the parties
concerned, we note that Archer attempted to justify his actions by claiming duties to his
deceased brother Branch in regard to the airport building property. Archer, however, did
not dispute the testimony of Sterquell and Harris that through their prior business dealings
with Archer they came to trust him, they brought the airport building investment to him
originally, and, because of their prior business relationships, had no cause not to trust him
to both fulfill his fiduciary duties as a partner and to deal with them fairly. 

 The evidence showed that Archer's net worth at the time of trial exceeded
$2,000,000 individually, and that his PST had net value of over $4,300,000. Testimony
indicated that he had unspecified contingent liabilities based on loans he had personally
guaranteed. 

 During final summation at the exemplary damages portion of the trial, counsel for
Sterqulll and Harris did not attempt to stir the emotions or passion of the jury. Counsel
made a simple plea that the jury should follow the jury charge and award exemplary
damages sufficient to appropriately punish Archer and to serve as an example to the
community. Counsel did not suggest any amount or ratio of exemplary damages to actual
damages. The record does not indicate that the award was the result of passion or
prejudice on the part of the jury. 

 In considering all the evidence, we conclude that the evidence is factually sufficient
to support the jury's exercise of discretion to award exemplary damages against Archer and
in favor of Sterquell. Accordingly, we sustain Archer's sixth issue to the extent it challenges
the Constitutionality of exemplary damages awarded in excess of four times actual
damages. We overrule the issue to the extent it challenges the factual sufficiency of the
evidence to support the award.

 As set out hereafter in our Conclusion, subject to remittitur by Sterquell of
exemplary damages awarded in excess of four times Sterquell's actual damages, the
judgment in favor of Sterquell will be affirmed. III. HARRIS'S APPEAL

 Harris appeals the trial court's refusal to enter judgment in his favor for the actual and
exemplary damages found by the jury. He premises his argument on jury findings that
Sterquell did not consent in writing for Harris to sell his interest in the partnership or building,
and that Archer breached his fiduciary duty to Harris. He urges that the jury finding in
response to question 15 that Harris agreed to sell his interest in the partnership and airport
building before the AEDC expressed an interest to Archer in purchasing the building, was
improperly submitted, was not controlling, was without evidentiary support and was
rendered moot by the jury's finding in question 17 that Sterquell had not given his consent
in writing for Harris to sell his interest. Harris claims that question 15 was improperly
submitted because (1) it was not submitted conditioned on a finding that Sterquell had given
his prior written consent to a sale; (2) Harris objected to submission of the question without
such condition (among other objections to the question's submission); (3) the jury finding
that Harris agreed to sell his interest is immaterial; and (4) without a finding that Sterquell
gave his prior written consent, the terms of the partnership agreement make any purported
sale or transfer void. Harris further notes that a mere agreement to sell would not terminate
his status as a partner until the sale was consummated. 

 Archer seeks to sustain the trial court's entry of the take-nothing judgment for the
same reasons, in part, that he asserts in appealing the judgment in favor of Sterquell. 
Without detailed elaboration of the parts of the cross-points which are substantively the
same as his assertions as to Sterquell, and for the reasons stated in our disposition of
Archer's appeal as to Sterquell, we overrule those respective parts of Archer's cross-points
three, four and five that we do not specifically address hereafter. 

 In addition to the issues which are in common with his appeal as to Sterquell, Archer
urges that the judgment as to Harris should be affirmed for the following reasons: (1)
Sterquell consented to the sale of Harris's partnership interest and the jury finding that
Sterquell did not express his consent in writing for Harris to sell is not supported by legally
or factually sufficient evidence (reply point one); (2) the jury finding that Harris agreed to sell
his partnership interest is a controlling finding and was properly submitted (reply point two);
(3) Archer consented to Harris's December, 1993, sale of his partnership interest to Branch
Archer, therefore any fiduciary duty owed by Archer to Harris was terminated by the sale
in December (cross-point two, subpart one); (4) Harris materially breached the partnership
agreement by selling his interest without Sterquell's consent, thereby dissolving the
partnership and terminating any duty on behalf of Archer to disclose the AEDC offer (cross-point two, subpart two); (5) Harris is estopped from claiming that a breach of fiduciary duty
or fraud on the part of Archer induced Harris to sell his partnership interest in July, 1994,
because by executing the July 1st agreements Harris ratified the December, 1993, sale of
his interest (cross-point five, subpoint two); (6) Harris's execution of documents in
December, 1993, transferring his partnership interest and Harris's acceptance of Branch
Archer's check effected a dissolution of the partnership (cross-point five, subpart three); and
(7) the jury's answers to question 2 (Archer failed to comply with his fiduciary duty to Harris),
question 5 (Archer committed fraud against Harris), and question 7 (actual damages) are
not supported by factually sufficient evidence (cross-point six). As cross-point one, Archer
asserts that the exemplary damages awarded by the jury are not appropriate under the
facts, are Constitutionally excessive, and should be limited to four times actual damages
if judgment is rendered for Harris. We will consider the positions of Harris and Archer in a
logical, not numerically sequential, manner. 

A. HARRIS'S ASSERTIONS

 The jury's findings warrant judgment for Harris unless the trial court was correct in
granting judgment NOV on the basis of the jury's finding in response to question 15. We
will first address Harris's assertion that the answer to question 15 should have been
disregarded. 

 A proper jury question must be properly submitted, supported by evidence and call
for a material finding. See Southeastern Pipe Line Co., v. Tichacek, 997 S.W.2d 166, 172
(Tex. 1999). The jury's answer to question 15 (the finding that Harris agreed to sell his
partnership interest before the AEDC expressed an interest in purchasing the building) is
to be disregarded if it is without support in the evidence or if it is immaterial, as Harris
contends. Id. A question is immaterial when it should not have been submitted, it calls for
a finding beyond the province of the jury, such as a question of law, or when it was properly
submitted but has been rendered immaterial by other findings. Id. 

 As part of his defense in the lawsuit, Archer asserted that the partnership agreement
was void, and in the alternative, that he was entitled to rescission of the agreement. We
have previously addressed such contentions in regard to Archer's appeal from the summary
judgment and instructed verdict against him. In doing so, we determined that the
partnership agreement was not void and that Archer was not entitled to rescind the
agreement on the bases urged. Accordingly, the partners were bound by the partnership
agreement and governed by the agreement's provision that a partner could not "sell, assign,
transfer, encumber or otherwise dispose of any Partnership interest without the prior written
consent of the other Partners, and may not pass title to any Partnership interest in the
absence of such consent," and that any transfer prohibited by such provisions "shall be
void." 

 Archer does not assert that Sterquell gave written consent prior to what Archer
consistently refers to as the December, 1993, sale of Harris's interest to Branch Archer. 
Instead, Archer maintains, and the trial court agreed, that Sterquell's January 7, 1994, letter
comprised written consent by Sterquell for Harris to sell his interest. Sterquell's letter,
however, addressed an agreement between Sterquell and Richard Archer that if Sterquell
did not purchase Harris's and Archer's interests by the end of January, then after the end
of January, Richard Archer (not Branch Archer or Randall Kubiak, Trustee) would have the
same option to purchase both Harris's and Sterquell's partnership interests. Archer does
not maintain, and there is no evidence, that Harris sold his interest to Richard Archer
pursuant to Sterquell's January 7th letter. 

 The trial court recognized, as do Archer, and Harris, that there is no evidence of
written consent by Sterquell prior to Harris's December agreement to sell and Harris's
execution of the transfer documents on December 22nd. On the other hand, there is
evidence that Harris, Richard Archer, and Branch Archer intended and considered that the
December activities did not result in a "sale" and transfer of Harris's partnership interest
under the circumstances then in existence. In this regard, the record reflects that (1) Branch
Archer testified he did not want to be partners with Sterquell, which would have been the
result if Branch had validly purchased Harris's partnership interest in December; (2) Harris
signed documents of sale to Randall Kubiak, Trustee, in December, but left the documents
and Branch Archer's purchase money check with Richard Archer along with a note for
Richard to keep the check and documents so that everything "Stays like it is until Steve
signs everything needed"; (3) testimony evidenced discussions between Richard Archer and
Harris as to the absence of Sterquell's consent and its possible effect on the purported
December sale of Harris's partnership interest; (4) via a letter dated January 3, 1994,
Sterquell advised Harris and Allison that he did not desire to sell his partnership interest, but
wanted to purchase Harris's interest, as well as that of Archer, on "the same terms and
conditions that have been offered"; (5) in a letter to Sterquell dated February 19, 1994,
Harris referenced Sterquell's failure to purchase Harris's and Archer's partnership interests
in January and that "I'm now trying to sell my 1/3 interest to Richard Archer."

 Question 15 is material (17) because it finds support in the evidence, and an agreement
to sell, or meeting of the minds, between Harris and a purchaser of his partnership interest
is an element of a valid sale of the interest. The submission, however, is defective because
the question of whether Harris sold his interest with Sterquell's prior written consent was not
submitted. See Tichacek, 997 S.W.2d at 172. Harris objected to the failure to submit the
additional questions or instructions necessary to support Archer's defense. (18) Thus, there
can be no deemed findings in support of the additional necessary findings. See Tex. R. Civ.
P. 279. Furthermore, even if such additional findings had been made by the jury or by the
trial court, there is no evidence to support the additional findings. Accordingly, there are
neither sufficient jury findings nor evidence to support Archer's defense that Harris sold his
partnership interest in compliance with the partnership agreement terms prior to Archer's
negotiations with the AEDC, and that Archer did not owe Harris a fiduciary duty to disclose
the negotiations. See Exxon Corp. v. Breezevale Ltd., 82 S.W.3d 429, 439
(Tex.App.-Dallas 2002, pet. denied). 

 The trial court erred in disregarding the findings in favor of Harris and rendering
judgment for Archer based on the jury's answer to question 15. 

B. ARCHER'S REPLY AND CROSS-POINTS

1. Reply Point One: Sufficiency of the Evidence 

That Sterquell did not Consent in Writing for Harris to Sell 


 Archer's first reply point challenges the legal and factual sufficiency of the evidence
to support the jury's finding via question 17 that Sterquell did not express in writing his
consent for Harris to sell his interest in the partnership. 

 Sterquell did not dispute Archer's contention that Sterquell's letter of January 7,
1994, granted Richard Archer the right, at least for some period of time, to purchase both
Harris's and Sterquell's partnership interests if Sterquell did not purchase Harris's and
Archer's interests in January. The undisputed evidence, however, is that (1) Sterquell did
not consent in writing to a sale by Harris prior to Harris's agreement to sell to Branch Archer
and execution of the transfer documents dated December 22, 1993, and (2) Harris neither
sold nor transferred his interest to Richard Archer pursuant to Sterquell's January 7, 1994,
letter. 

 Under this record, question 17 was immaterial. See Tichacek, 997 S.W.2d at 172. 
The evidence conclusively proves that Sterquell did not give prior written consent, as
required by the partnership agreement, to a transfer of Harris's partnership interest. Reply
point one is overruled. 

2. Reply Point Two: Did Harris's December Agreement

to Sell Result in Termination of the Partnership? 


 Reply point two urges that the jury finding in response to question 15 that Harris
agreed to sell his partnership interest before the AEDC contacted Archer is a controlling
finding, properly submitted, and resulted in termination of the partnership. 

 The facts surrounding Harris's undisputed December, 1993, agreement to sell his
interest to Branch Archer, whether an absolute or contingent agreement, do not support
Archer's claim. Harris's agreement did not terminate the partnership absent some
additional action and expression of intent by Harris. See M.R. Champion, Inc, 904 S.W.2d
at 618; Rodgers, 816 S.W.2d at 547. Archer's reply point two is overruled. 3. Cross-Point Two: Archer's Fiduciary Duties Were

Terminated by Archer's Consent to Harris's Agreement to Sell 


 In his cross-point two, Archer advances two bases for our affirming the take-nothing
judgment as to Harris. First, Archer contends that because Archer consented to Harris's
December, 1993, "sale" of his partnership interest, as a matter of law Archer's fiduciary
duties to Harris as a partner were terminated by Harris's "wrongful actions" in transferring
his partnership interest in violation of the partnership agreement. Archer claims that Harris's
actions were wrongful as to Archer because Archer believed and relied on Harris having
received consent from Sterquell to transfer Harris's interest. However, Archer's assertions
that he relied on Harris's having received consent from Sterquell and Archer's conclusion
that Harris intended to wrongfully transfer his partnership interest without Sterquell's
consent are without foundation on a jury finding. The record contains evidence that, at a
minimum, creates fact questions on both matters. Nor does Archer cite authority for the
proposition that his verbal consent for Harris to sell his partnership interest effected a
dissolution of the partnership, other than a law review article which criticizes the Rodgers
decision and which suggests that a transfer of a partnership interest in violation of specific
language of the partnership agreement should be dealt with as a wrongful dissolution. 

 We disagree with Archer's position. The provision agreed to by the parties in their
partnership agreement as to the effect of an attempted or actual transfer of a partnership
interest without prior written consent of the other partners is clear. The partners agreed that
such a transfer would be void. Thus, the documents executed by Harris in December,
1993, transferring his partnership interest to Randall Kubiak, Trustee, were void. See
Rodgers, 816 S.W.2d at 547; Kelly v. Kelly, 411 S.W.2d 953, 954-55 (Tex.Civ.App.--Houston 1967, writ ref'd n.r.e.). Because the December, 1993, documents of transfer were
void, Harris did not effectively transfer his partnership interest in December, 1993. See
Rodgers, 816 S.W.2d at 547. Nor did he transfer them thereafter, until July, 1994. Archer
and Harris continued to be partners until the July 1, 1994, sale of Harris's partnership
interest. Id. Archer continued to owe fiduciary duties of a partner to Harris until the July 1st
sale terminated Harris's status as a partner. Id. 

 Next, Archer contends that Harris materially breached the partnership agreement
when he sold his interest without Sterquell's consent, because the agreement is clear that
such a sale is prohibited. Archer reasons that the material breach effected a dissolution of
the partnership and that he thereafter owed no duty to offer his former partners a business
opportunity which arose after the partnership terminated. He relies on M.R. Champion, Inc. 

 We disagree with Archer's reading of Champion. In Champion, the jury found that
Mizell, a partner, breached the partnership agreement and also conducted himself in a way
that it was not reasonably practicable to carry on partnership business. Based on such jury
finding, the trial court found that Mizell's conduct effected a termination of the partnership. 
Champion does not hold that a material breach of a partnership agreement, without more,
effects a dissolution of the partnership. See Tex. Rev. Civ. Stat. Ann. art. 6132b-6.01(b)(5)
(Vernon Supp. 2004) and its predecessor statute, art. 6132b § 27; M.R. Champion, Inc.,
904 S.W.2d at 618, n.1. 

 Moreover, Archer assumes, without a jury finding to support his position, that Harris's
December actions constituted a material breach of the agreement because Harris intended
to sell his interest without Sterquell's consent. Harris contests that assumption and points
to evidence in the record which supports his position that his "sale" to Branch Archer was
contingent on Sterquell's consent and concurrent sale of Sterquell's partnership interest to
Branch Archer. Unlike the record in M.R. Champion, Inc., this record does not contain a
jury finding that Harris both breached the partnership agreement and exhibited other
conduct sufficient to warrant termination of the partnership. 

 We overrule Archer's cross-point two. 

4. Cross-Point Five: Did Harris Release His Claims, Ratify the 

December Transaction or Dissolve the Partnership?


 By cross-point five, Archer presents three bases for his claim that the judgment as
to Harris should be affirmed. Subpoint one urges that Harris released his claims for breach
of fiduciary duty by execution of the July 1, 1994, agreements. We have addressed and
overruled the same assertion previously in determining Archer's fourth issue as to Sterquell. 
For the reasons expressed previously, we conclude that subpoint one is without merit. 

 Subpoint two asserts that Harris is estopped from claiming that a breach of fiduciary
duty or fraud on the part of Archer induced Harris to sell his partnership interest in July,
1994, because by executing the July 1st agreements Harris ratified the December, 1993,
sale of his interest. Archer cites Steubner Realty 19 for the position that Harris is precluded
from asserting that he did not agree in December, 1993, to sell his partnership interest
because such a position is inconsistent with the recitation in the July 1st agreements that
Harris was confirming the December agreement. Archer's premise is faulty. 

 Harris claims that although he agreed to sell his interest to Branch Archer in
December, the agreement was subject to Sterquell's also selling, and Sterquell's consent
to the sale. Harris further claims that in December, January and February, Sterquell, Archer
and Harris all recognized that according to the language of the partnership agreement, (1)
Harris's December agreement could not be consummated because Sterquell did not
consent; (2) any attempt to sell or transfer Harris's interest without Sterquell's written
permission was void; and (3) Harris remained as the owner of his partnership interest. 

 The recitation in the July agreements was not inconsistent with Harris's position that
he made a contingent agreement in December to sell to Branch Archer, the agreement was
not consummated, and that Archer and Harris continued to be partners until the July 1st
agreements were executed. The recitations did not estop Harris from claiming that he was
fraudulently induced to execute the July 1st agreements. 

 Archer does not cite authority for or argue his statement in subpoint two that
execution of the July 1st agreements and failure to seek their rescission was ratification of
the December "sale." To the extent that ratification is urged in subpoint two, it is
inadequately briefed. 

 Subpoint three asserts that Harris's execution of transfer documents in December
effected a dissolution of the partnership. This is a shade of the argument Archer presented
in cross-point two, subpart two, and which we found to lack merit. In this subpoint, Archer
references authorities cited in his fourth issue as to Sterquell by which he urged that
Sterquell dissolved the partnership via his January 7, 1994, letter offering to buy the
interests of Harris and Archer. Archer presents his contention without referencing language
in the documents Harris signed on December 22nd that manifested Harris's express will to
dissolve the partnership, or a jury finding that in addition to merely executing the
documents, Harris intended to dissolve the partnership or that Harris conducted himself in
such a manner as to effect dissolution. See M.R. Champion, 904 S.W.2d at 618 and n.1. 
The evidence does not establish as a matter of law that Harris dissolved the partnership by
execution of the documents. Subpoint three is without merit. 

 We overrule cross-point five. 

5. Cross-Point Six: Factual Insufficiency

of the Evidence that Archer Breached a Fiduciary Duty, 

Committed Fraud and Caused Actual Damages


 By cross-point six Archer challenges the factual sufficiency of the evidence to support
the jury findings in response to jury questions two, five and seven. In response to question
two the jury found that Archer failed to comply with his fiduciary duty to Harris; in response
to question five, that Archer committed fraud against Harris; and in response to question
seven, that Harris was actually damaged in the amount of $101,947.50. Archer does not
cite authorities and does not argue in support of his assertion, other than positing that the
findings are against the overwhelming weight of the evidence "for the foregoing reasons and
considering the evidence already described." The cross-point is inadequately briefed and
fails to present error for review. See TRAP 38.1(h); General Serv. Comm'n v. Little-Tex
Insulation Co., 39 S.W.3d 591, 598 n.1 (Tex. 2001) (citing former TRAP 74(f), now TRAP
38.1(h)); Fredonia State Bank v. General Am. Life Ins. Co., 881 S.W.2d 279, 283-84 (Tex.
1994).

6. Cross-Point One: Exemplary Damages

 Archer's first cross-point challenges the jury's exemplary damages award in favor
of Harris as being Constitutionally excessive and based on factually insufficient evidence. 
He relies in the main on the same arguments and authorities as he presented in his similar
challenge to the exemplary damages awarded to Sterquell. 

 Our prior review of the Gore guideposts in regard to Sterquell's exemplary damages
award is applicable to the excessiveness issue as to Harris, with one exception. The
exception is one part of the first Gore guidepost. In considering the degree of
reprehensibility of the defendant's actions, we are to consider, in part, the financial
vulnerability of the target of the defendant's conduct. Campbell, 123 S.Ct. at 1521. In doing
so as to Harris, we conclude that the evidence does not show he was in a vulnerable
financial position. For example, the evidence did not show that he was depending on the
partnership for income or living expenses, was expressing any concerns over remaining in
the partnership with the attendant financial obligations of a partner, or was anxious to
realize profit from the venture because of debts or financial obligations. His PST was the
actual partner in the partnership. Harris was retired from his banking career. Over a year
before Archer called him to come to Amarillo to work on settlement of the partnership
accounts, he had moved away from the Amarillo area where the partnership property was
located. Our review of Harris's financial vulnerability, taken in conjunction with our
reasoning as previously set out in regard to the Constitutional excessiveness of the
exemplary damages awarded against Archer yields the conclusion that the exemplary
damages in excess of four times Harris's actual economic damages exceeds the ratio
permitted by the Due Process Clause of the Fourteenth Amendment. See id. at 1524;
Apache, 960 S.W.2d at 750. Because we sustain Archer's issue on the basis of the Federal
Constitution's Due Process Clause, we do not consider his arguments as to the Texas
Constitution. See TRAP 47.1. 

 In addressing Archer's contention that the evidence is factually insufficient to support
the exemplary damages award, and for the reasons set out in our review of exemplary
damages awarded to Sterquell, we review the evidence to determine if it is factually
sufficient to support exemplary damages which are four times actual damages. For the
factors we consider in determining factual sufficiency of the evidence and our analysis of
the evidence as to those factors, we refer the parties to our discussion of the same
contention as to Sterquell. 

 In addition to contesting the factual sufficiency of the evidence to support exemplary
damages in favor of Harris on the same basic bases as he did as to Sterquell, Archer, in
part, emphasizes that the facts as to Harris's agreement to sell his partnership interest differ
from those as to Sterquell. Archer points to facts showing that in December, 1993, Harris
agreed to sell his partnership interest, executed transfer documents, and cashed the check
from Branch Archer. Archer then argues that it was legitimate and reasonable for him to
believe Harris's actions constituted a completed transaction, Archer had a good faith belief
that Harris had sold his interest to Branch in December, and that such matters militate
against exemplary damages which are four times actual damages. 

 The evidence on which Archer bases his arguments, however, are only part of that
before the jury. We must consider all the evidence in reviewing factual sufficiency to
support the exemplary damages. Archer's assertions as to his subjective beliefs and good
faith and reasonableness in holding those beliefs were for the jury to evaluate in conjunction
with the remainder of the evidence. Our review of all the evidence, as set out here and in
prior parts of the opinion, leads us to the conclusion that the evidence is factually sufficient
to support the award of four times actual damages as exemplary damages against Archer
and in favor of Harris. 

 We sustain Archer's first cross-point to the extent it challenges the Constitutional
excessiveness of the exemplary damages award. We overrule the cross-point to the extent
it challenges the factual sufficiency of the evidence. CONCLUSION Archer has requested that if the result of our review results in judgment for exemplary
damages against him, and if we determine that the exemplary damages awards are
excessive, then we order a remittitur of the excessive amount of the damages. See Apache
Corp., 960 S.W.2d at 750. Neither Sterquell nor Harris have sought rendition of judgment
for the amount of exemplary damages which are not excessive, in the event we were to find
the exemplary damages excessive to some degree and also determined that judgment
against Archer was proper. We are limited to the relief sought by the parties. See Stevens
v. National Educ. Ctrs. Inc., 11 S.W.3d 185, 186 (Tex. 2000). Accordingly, even if it were
proper to do so otherwise, we may not render judgment for Sterquell or Harris for the
amounts of exemplary damages which are not Constitutionally excessive. 

 If, within 20 days from the date of this opinion, Sterquell remits the exemplary
damages in excess of $407,790 which were awarded to him, we will affirm the judgment as
to him. Otherwise, the judgment as to Sterquell will be reversed and remanded to the trial
court. 

 We reverse the trial court judgment as to Harris. If, within 20 days from the date of
this opinion, Harris remits the exemplary damages in excess of $407,790 which the jury
awarded to him, we will render judgment in favor of Harris for $101,947.50 actual damages
and $407,790 exemplary damages. Otherwise, the claims as to Harris will be remanded
to the trial court. 

 

 Phil Johnson

 Chief Justice 

 
1. John T. Boyd, Chief Justice (Ret.), Seventh Court of Appeals, sitting by
assignment.
2. For purposes of brevity, we will on occasion refer to Harris, Archer, and Sterquell
in their individual capacities without so noting. We will rely on the context to indicate the
capacities in such instances. When it is important to distinguish their individual actions
from their actions as trustees, we will specifically so note.

 
3. Our prior opinion sets out certain facts reflected by the summary judgment proof
in the record as then presented. We recognize that some of the facts presented by
summary judgment proof may seem to vary from facts established by or which are inferred
from trial evidence as noted in this opinion.
4. The letter was dated January 3, 1993. No one contended, however, that the
correct date was not actually January 3, 1994. 
5. Branch Archer died before trial. His testimony was by deposition.
6. Both Archer and Sterquell testified that the statement referencing December
negotiations and agreement for Sterquell to sell his partnership interest was false. 
Sterquell testified that he signed the agreement with the statement in it because the
negotiations lasted long into the evening, he was tired, and Archer made threats to sue
Sterquell over some of their other transactions if Sterquell did not settle. 
7. American Housing Foundation was a non-profit entity through which tax-advantaged real estate transactions were undertaken. Sterquell was its president. 
8. Archer relied on documents establishing the Richard O. Harris Profit Sharing Trust
which were not executed until November, 1993. The written PST documents recited an
effective date of January 1, 1993, for the PST. 
9. The issues, arguments and authorities presented by Archer and Reba are the
same, to the extent the appeal presents issues by Reba. Our use of the term "Archer" as
to the issues presented and arguments made shall encompass all issues and arguments
of Reba unless otherwise noted. 
10. Further references to a rule of appellate procedure will be as "TRAP_".
11. Sterquell's actions are in contrast to those of Archer. Archer ratified the
partnership by failing to take action to protest the circumstances or rescind the partnership
after he had knowledge of the actions he relied on in his rescission claim: Sterquell's failure
to move AHF offices into the airport property, Sterquell's bankruptcy, and Sterquell's
alleged failure to contribute the initial capital. 
12. See Sommers v. Concepcion, 20 S.W.3d 27, 34-35 (Tex.App.--Houston (14th Dist.)
2000, pet. denied). 
13. See Dow Chem. Co. v. Francis, 46 S.W.3d 237, 241-42 (Tex. 2001); Sterner v.
Marathon Oil Co., 767 S.W.2d 686, 690 (Tex. 1989). 
14. Further reference to a provision of the Texas Civil Practice and Remedies Code
shall be by reference to "TCPRC § ____."
15. The Kraus factors are considerations encompassed within the Gore guideposts. 
See Apache, 960 S.W.2d at 749. The Kraus factors are (1) the nature of the wrong, (2)
the character of the conduct involved, (3) the degree of culpability of the wrongdoer, (4) the
situation and sensibilities of the parties concerned, and (5) the extent to which such
conduct offends a public sense of justice and propriety. Kraus, 616 S.W.2d at 910. See
also Moriel, 879 S.W.2d at 31. 
16. Thus, we express no opinion on what effect, if any, the Texas Legislature's
exemption of certain conduct from the limitations of TCPRC Chapter 41 would have in
regard to a Federal Due Process excessiveness issue.
17. Because we determine that Archer's submission was defective and because of our
conclusion based on the submission, we do not consider whether the jury's finding that
Harris agreed to sell his interest before the AEDC contacted Archer was rendered
immaterial by the jury finding in response to question 17 that Sterquell did not consent in
writing for Harris to sell. See our discussion of question 17 in regard to Archer's reply point
one, infra. 
18. We are not unmindful of Harris's citation to authorities holding that a jury cannot
properly answer a question as to whether an effective transfer of partnership interest has
occurred because the question is one of law. See Rodgers, 816 S.W.2d at 546; C & C
Partners v. Sun Exploration & Prod. Co., 783 S.W.2d 707, 715 (Tex.App.-Dallas 1989, writ
denied).